Attorney at Law, Steves & Smith whenever you're ready, counsel. May it please the court, your honors. Jack Fyander. I serve as the general counsel for the Soxhoatl Indian tribe. I appreciate the court having given us 20 minutes per side, but that's still not enough time to discuss United States versus Washington. That has been ongoing for all these years. I would like to try to cover as much as I can in about 15 minutes and perhaps save five both for rebuttal and because I know during the 15 minutes I'm not going to be able to say everything I want to say or that needs to be said, and I'll think of it and remember it during that time between argument and rebuttal. I'd like to start with some background, which I think is the strongest argument in favor of the Soxhoatl Indian tribe, at least as to its right to harvest in marine waters, which was denied by the district court. So, on September 18, 1970, that's when the United States Attorney for the Western District of Washington, then Stan Pitkin, filed the initial complaint invoking the court's jurisdiction over this case. I can't provide you with it because there was no electronic filing in 1970. It's housed in, you know, the archives of the district court. I had a copy once, but I can tell you that the parameters of the complaint were seeking a declaratory judgments that treaties with the tribes in western Washington state provided them with a copy of the case. A right to harvest anadromous fish and sought a declaratory judgment to that effect and sought a permanent injunction in joining the state of Washington from interfering with that right. But you don't have to go to the complaint because if you go to the very first paragraph of Judge Bolt's decision at 384 FEDSUP 327, it provides that the United States filed the complaint initiating this action against the state of Washington Department of Fisheries, and Department of Game. To quote Judge Bolt, by statute, the Department of Fisheries is charged with regulatory authority. Can I help you move along? Because for me, the issue is what's the meaning as it applies to this case of paragraph 25A6? That is, but can I address that later? Because I was just about to tell you why the tribe should prevail in this case. I don't mean to rearrange your argument. Yeah, but at some point I'd like to know your argument with respect to that paragraph. I will. Well, according to Judge Bolt, in the first paragraph, the State Department of Fisheries exercised regulatory authority over anadromous salmon and the Department of Game regulated anadromous steelhead trout. That was the scope of the complaint, anadromous fish, which are salmon and steelhead, and incidentally, bullhead trout. So, the finding of fact of the tribe's customary fishing grounds in 1974 listed in finding of fact 131 is a non-exclusive list where Judge Bolt concluded that the Soxhawatta tribe harvested anadromous fish. Well, I mean, the record talks specifically about the Soxhawatta tribe had traveled down to the saltwater to procure marine life unavailable in their own territory. So, my question is, then nothing was said in terms of an allocation, and in later years, the Stiligwamish tribe was able to bring claims in a subproceeding with kind of a similar ambiguous statement. So, what I would appreciate understanding from you is, is that reference and acknowledgement that the tribe, obviously, given where it's located, needed to travel down to the ocean in order to harvest. Does that have any impact other than an acknowledgement and then leaving the question open? Or is there a negative inference that by making the statement, then not specifically giving an allocation that there is no customary use there? Okay, the scope of the case at that time was to determine rights to anadromous fish and where those were harvested. That was the scope of the case. And it was not until after 1989 when the United States initiated a subproceeding within the United States versus Washington to determine the rights to other marine life, specifically shellfish, which were previously outside the scope of the original proceeding. So, in ER 61, Barbara Lane's testimony was that, yes, the tribe harvested salmon and steelhead in its area, but they traveled to the marine waters, particularly to harvest shellfish. Okay, a very vague statement. Okay, Judge Boat, in finding of fact 132, after finding in 131 the tribe's right where it could harvest a non-exclusive list of anadromous fishing sites, put in 132 that an even broader interpretation that the tribe traveled to the saltwater to harvest marine life. He didn't just say shellfish. Okay. But at the time in 1974, that was just Ipsy Dixon because that was outside the scope of the case. Okay. So, I mean, the bottom line that you're suggesting is that without a clear allocation, even though there's this mention that at this point, those marine claims still prevail and in a broad sense marine life, not limited to any kind of either fish or shellfish, right? Is that your claim? Let me address it by referring to the answering brief of the Swinomish tribe at page 33, which cites a sub-proceeding from 1991 where the Makah, Quileute, and Quinault tribes sought within the case to establish customary fishing grounds out in the Pacific Ocean. Okay. That was denied back then because the case was limited to waters of the state of Washington and they were claiming customary fishing areas that were like 40 miles out, but at the time there was a three mile limit that coastal waters were subject to. Okay. So that was denied. But you can see from page 33 of Swinomish's answering brief that later when Congress extended the three mile limit to 200 mile limits, those tribes were able to present their claims to those waters 40 plus miles out. And the argument they prevailed on was that our rights could not have been determined by Judge Bull in the initial decision because waters more than three miles out were beyond the jurisdiction then of the court. Once that changed, they could assert those rights as long as they were within 200 miles. By analogy, the same thing here. The complaint and Judge Bull's decision at the very end says we're dealing with anadromous fish. It was not until 1989 when there was a separate sub proceeding over which Judge Edward Rafiti from the Northern District of California was assigned determined that a fish is a fish and shellfish are fish, which expanded the continuing jurisdiction of the court. And that case was allowed to proceed. Why that's important is because other marine life, which were originally outside the scope, and it's acknowledged ambiguously that the tribe traveled there to do that. It includes clams, crabs, oysters, scallops, anemones, all these other species that could not have been determined in 1974. It was not only anadromous fish. And that's what the tribe is trying to assert now. And it's very important because this is not 1974. It's 2026 when three species of anadromous fish are on the threatened species list. But let me ask you this question. With respect to your tribes seeking rights in the saltwater, are you seeking only shellfish or are you seeking also anadromous fish in the saltwater? Well, after Judge Rafiti ruled that it doesn't make a difference, a fish is a fish. No, I'm asking you what your tribe is seeking here in this litigation. All fish. Including fish that swim. Yeah, anything that swims.  But I also, I know we have somewhat limited time, but of course the briefing is quite extensive here with amicus and multiple tribes weighing in. So I want to turn your attention to the Baker River. Yeah. And just understand, I want to talk about the present and then I want to go back in history. So what tribes are currently harvesting from the Baker River and is that under a settlement agreement or a management agreement with the Federal Energy Regulatory Commission? My understanding, and Mr. Hawkins, who's here for the upper Skagit tribe may be able to answer that better, but my understanding that the Swinomish tribe and the upper Skagit tribe harvest salmon in the Baker River. My understanding is that that was by agreement because according to Judge Bolt, customary fishing grounds can be established by agreement or stipulation or by trial or hearing. That's my understanding. But as to the Baker, where the district court made an error in interpreting the tribe's request for determination of additional fishing grounds, including the Baker. The district court said, well, the Soxhawatta tribe's rights have already been adjudicated and in your request for determination, the supporting facts that you assert are a report by Barbara Lane, Ph.D., the queen anthropologist of the Bolt case. But and he said, that's not new evidence. Well, if you look at an excerpt of Record 12, that was an error by the district court because the law of the case, according to many statements in Judge Bolt's decision regarding claiming additional fishing grounds, you don't have to. Are you splitting your time with other counsel or you're claiming the full 20 minutes?  Okay. I misunderstood that. Okay. And I just lost 30 seconds there. But if you look at excerpt of Record Number 12, the district court erroneously concluded like, well, Judge Bolt already considered the testimony of Barbara Lane, but what was referred to in the tribe's request for information was a report prepared by Barbara Lane specific to the Baker River, which was not prepared. Until 1980.  Right. It could not have been considered by Judge Bolt in 1974. Has any court actually considered this 1980 Dr. Lane and her husband report to this date? No, it was my recollection. I called in the 1990s in sub proceeding 93-1. The upper Skagit had proposed submitted it as a proposed exhibit in that sub proceeding and then withdrew it. So it hasn't been considered. It's new information specific. I just want to go back to my first question. I didn't quite understand your answer. On the Baker River now, does your tribe actually currently harvest any fish from the Baker River? No, we do not. Okay. On the Baker River. Yes, I think that equitable adjustment or allocation would have to be made. I guess the tribe's position is, is that how the Baker River works as a result of its FERC relicensing. Those are primarily hatchery fish. They're captured below the dam in a trap transported above the dam where they can go to the hatchery.  Counsel, you wanted to reserve five minutes. You're down to four minutes. Do you want to reserve the balance of your time? Yeah, I do. I've got a lot to cover. Maybe we can let him answer this question. I'm sorry. I'm sorry. I didn't realize you were. Yeah, but would the court entertain a couple of extra minutes beyond the four? Just because I've had to answer your questions and kind of interrupted my. Well, that's kind of the purpose is that by answering our questions, you're informing us. So just so you know. I'll reserve the rest. Thank you, Counsel. Good morning, Your Honors. And may it please the court. How's my sound? Sounds a little weird. Okay. Good morning, Your Honors. And may it please the court. My name is Emily Haley. I'm here on behalf of the Swinomish Indian Tribal Community, arguing on behalf of the appellees. I will address why the district court correctly concluded that it lacks subject matter jurisdiction and dismissed SOC's latest attempt to open treaty fisheries outside the waters that Judge Bolt determined were its UNA in 1974. My colleague, Mr. Hawkins, will then address the procedural history in greater detail to demonstrate why SOC's claims are foreclosed under various finality doctrines. In its briefing and comments today, SOC has made a jumble of arguments, but the primary issue and the one that I want to start with is your question, Judge Fletcher, which is the significance of paragraph 25A6. So that is the primary issue in this case. If SOC's finding has been specifically determined, then there is no continuing jurisdiction under paragraph 25A6, and the district court properly dismissed. And this court should affirm that dismissal for two reasons. First, the district court concluded that SOC's UNA finding was, quote, unambiguous, specifically determined, and excludes any unnamed waters. For closing 25A6 jurisdiction, this finding is not only reasonable, but actually compelled by this court's 2023 decision in Upperskagit v. SOC and should be upheld. And second, the Muckleshoot line of cases discussed in our briefing at length forecloses SOC's attempt to use 25A6 to relitigate the scope of SOC's UNA for the third time. Turning to the first issue, the district court's conclusion that SOC's UNA is unambiguous, specifically determined, and excludes unnamed waters is reasonable and should be upheld. You know, could you distinguish in your argument between the Skagit and the Baker rivers? Because the Skagit, we've got allocations with respect to various tribes. Baker, we've got nothing. So why is there not a claim here with respect to Baker? To the Baker. So I think that the answer to that goes back to this court's decision in the Upperskagit case. So there, the primary ruling in that case was that SOC's UNA finding is unambiguous, i.e., it included the waters that it listed and it excluded everything else. And because that case- But it said nothing about the other waters. Nothing about it. It says nothing about it, but if you look at the reasoning of the court, it first looks to the text of the finding and finds that on its face it's ambiguous. It then goes to the next step to say let's look at the evidence. And because that case involved fishing in the Skagit River, it looked at the Skagit River and to the evidence. And so it- It listed Skagit River and lots of tributaries to the Skagit, but at least in my mind, importantly, said nothing about the Baker. It didn't, but I think that the holding is equally controlling with respect to that because the finding is unambiguous and because all of the evidence- As far as it goes, it's unambiguous, but there is nothing at all about Baker. Well, there was evidence about the Baker. And so- Well, evidence is different from finding, right? It is different from a finding, but where you have- and I think that this is what the upper Skagit court held- where you have an unambiguous finding that lists streams, you have a subsequent action that interprets that finding in light of the evidence and says there's evidence that they lived on the Skagit River. There's evidence that they fished in the Baker River and the Skagit River with their upper Skagit relatives and friends. There's evidence that they went down to the salt water to procure marine life. All of that evidence was in front of Judge Bolt. And so while upper Skagit is strictly limited to the Skagit because that's where the illegal fishing occurred, its rationale is equally applicable to the Baker and to the marine waters because- Isn't there a difference here because Judge Bolt's discussion and inclusion of the Skagit and the upper Skagit UNAs and also the Swinomish was very, very specific. And by targeting those tribes and omitting the Salk Tribe, that, as the court had said, our court had said, that was an omission that was intentional. But the difficulty we have, or the challenge I should say we have, is that that same logic doesn't necessarily apply to the Baker River because it wasn't as if the Baker River was mentioned and it went here and there, but it excluded the Salk. The fact is, it wasn't mentioned in the final decision. So why doesn't that leave that open? So that particular aspect of the court's analysis to say, we find it significant that he did not include the Skagit in Salks, but he included it in Swinomish's and upper Skagits, I think is equally applicable to the Baker. In Swinomish's UNA, he does not name the UNA finding. He does not say Baker River, but he includes all of the tributaries, including the Baker River. How do you say that? Because he names the Skagit and then he names very specific tributaries to the Skagit, but he doesn't name all of the tributaries, nor does he say, and all of the tributaries. But he includes them all, right? How do you know he includes them all? Because the finding says the UNA includes the Skagit River and its tributaries with no limitation. And similarly with Marine Waters, Judge Bolt made Marine UNA findings. But as I look at paragraph 131, we've got named creeks, correct? Yes, that's right. And it doesn't say and all others, does it? No, that's exactly the point. That's the distinction I'm trying to draw, is that when Judge Bolt intended to include the Skagit River and all of its tributaries, he knew how to do that. He used that language in Swinomish's UNA finding. Similarly, when he wanted to include Marine Waters, he knew how to do that. He included Marine findings in Swinomish's UNA and in 17 other tribes' UNA. And the fact that he did not do that in Sauk's, when he had evidence in the record about what Sauk was doing in the Baker River, about what Sauk was doing in the saltwater, going to procure, to trade, is significant and indicates that he did not intend to include them, just like he did not intend to include the Skagit. A different point. What am I supposed to do with shellfish in the saltwater? And I understand the claim here is for shellfish and fish that swim, but I'm asking specifically now as to shellfish. Does the Sauk tribe have rights to the shellfish? I respectfully disagree with Mr. Fyander's characterization of what was tried to Judge Bolt. I had a question. What's your position with respect to the right of the Sauk tribe to shellfish? I do not believe that the Sauk has rights to shellfish. And why not? And what's the basis for that? Because Judge Bolt listed the places that Sauk has UNA. He did not include any marine waters. In a separate factual finding, he acknowledges that they go down to the salt to procure, not fish. And in the Lane report that is underlying that finding, she is explaining they go to trade. Let me ask you, though. I thought his point was a little bit different. And he was saying in the complaint, what we're talking about is swimming fish. And later, shellfish comes up in later proceedings. And therefore, it's not synonymous or it's not coextensive, the original Bolt findings. What is your response to this characterization of the complaint? I see I'm out of time, but if I may answer, it is true that Final Decision I was primarily focused on anadromous species. However, Dr. Lane's reports, which she prepared for almost all of the tribes, included all of their fishing activities. And so if you go through those reports, they are replete with discussing all different types of species, not just anadromous species, but mollusks, clams, dogfish, all manner of marine life. And so that and the places that the tribes were taking all of those species ultimately led to her conclusions about where the tribe had customary fishing and ultimately led to Judge Bolt's determination as to where the UNAs were. Later in the shellfish proceeding, there was a specific ruling that the marine and freshwater UNAs are synonymous. But that is not an artificial distinction that would allow SOC to go forward now on a claim to shellfish in marine waters. Thank you, Counsel. Thank you. You may please record. David Hawkins on behalf of the Upper Skagit Indian Tribe. Your Honor, I've put together a script here, but given the question I'd like to address some of the issues that you presented previously. First, as it relates to the Baker River, a little geography would be helpful here. I'm not sure if you're familiar with the Skagit, but the Skagit is one of the biggest rivers in the western region. It has a number of tributaries. One of them happens to be the Baker River. So when Judge Bolt discussed the Skagit River, he necessarily included it, and that's easily established by looking at what Upper Skagit's UNA was determined to be in Final Decision I. Judge Bolt found that Upper Skagit's UNA included the Skagit River. He didn't mention the Baker River, but it was understood that the Baker was part of that. And so in this instance, the idea that because the Baker River isn't specifically called out as being excluded in 2001, that's because it's understood that it's part of the Skagit River system. But wait a minute. I'm looking at paragraph 131. We're naming very specific rivers and creeks that are tributaries to the Skagit. That is correct, Your Honor. That does not include the Baker. It does not. That is Sauk's UNA, and Sauk's UNA is very clearly defined, and it's fairly limited. And the reason it's very limited is because it was based upon Barbara Lane's report, which specifically addressed the areas and those very creeks that are listed in this finding of fact. So the court was very aware of what evidence was presented in the original decision. But those creeks, they're saying the Sauk do not have rights with respect to them, correct? In paragraph 131. I'm sorry, Your Honor. I might not be understanding what you're saying. The 131 sets forth the UNA that Sauk does have. And so all of the creeks and the Sauk River that are listed in 131 are what they were able to prove through Barbara Lane's report as it pertains to what their UNA is. Notably, it does not include the Skagit. It does not, therefore, and another thing that's important from a geographical perspective just to help you, the Baker is far downriver from the Sauk. It's a long travel to get to the Baker from the Sauk. And there's reference in Barbara Lane's report talking about the Sauk fishing with upper Skagit tribal members. I would say that means by invitation, not as a matter of right, in the Baker River. So they were aware, the court was aware of the fact that Sauk did have some fishing at the Baker, pursuant to Barbara Lane's report, and yet did not include that in their UNA determination. There's another component as it relates to the law of the case. And the law of the case relates to adjacent waters and is helpful here. In sub proceeding 1901, Suquamish 1 and 2, you had adjacent areas that were adjacent to what a tribe was claiming to fish. They asserted their UNA included. The court found in both of those that if Judge Bolt did not include specific waters within a tribe's UNA, he determined not to include them for a reason. When you look at Lummi's UNA, for example, we had a case with Lummi where they had a very broad description of what their UNA was. We asserted that it did not include portions of Samish Bay. The court ruled in our favor because it looked to what the intent of Judge Bolt was at the time and the evidence that was before him. And there was nothing regarding the areas at issue there, and we prevailed. The same applies here. This is not a case of first impression. I mean, this is deja vu all over again. You have 2001, just three years ago, that addresses these very issues. Upper Skagit brought a 25A1 claim saying Sauk was fishing in violation of Final Decision 1. At the district court level, Sauk argued that they weren't violating Final Decision 1 because they were fishing within the confluence of the rivers, and therefore, they weren't in the Skagit. On appeal, they then argued 25A6, asserting that their UNA is ambiguous. Well, at that time, they should have come before the court and presented the evidence that consists of what they're claiming now. They attempted to do that, but they failed. It's the same thing here. Yet again, they're conflating the issues. When you talk about an opportunity to prove your case, we moved for a 25, I'm sorry, 12B1 factual motion to dismiss. When we filed our motion, they had the opportunity to respond with all of the facts and argument possible to support their claim. They, in fact, did that. If you look at ER, I think it's 31 to 35, I'm sorry, ER 31 to 36, they lay out their arguments there. They talk about the evidence. They talk about their previous sub-proceedings. Judge Martinez considered all of that. He decided, no, this issue has been resolved. 2001 gives you all the information you need here. SOC is coming for a third time now. Just to be clear then, the allocation and final decision that went to the Skagit and all of the tributaries would exclude SOC because when the UNA was allocated to SOC, Baker River was never mentioned as one of the creeks that it was allocated. Is that right? I believe that's correct, Your Honor. I have to think about that. But essentially, at the time in 74, when their UNA was established and Barbara Lane was looking at where they customarily fished at and before treaty time, keep in mind, this isn't talking about there's a specific standard here. This isn't just you travel down to the saltwater on occasion. There has to be frequency. There has to be a conduct at and before treaty time that meets the standard. Barbara Lane doesn't talk about them fishing in any of the disputed areas here. She doesn't talk about them fishing even in the saltwater areas. She talks about them fishing in the specific areas that are identified in 131 and no more. That is determinative here. Not only is it determinative, but it's been litigated here. So SOC is attempting to usurp the mandate that this court issued in 2001 and come back yet again to prove the same claim that they put forth in 2001 and failed. I don't know. I don't want to duplicate what we asked before. But obviously, we have many. We have decades of litigation here. I do have a question then because you've mentioned the marine claims. And counsel seemed to distinguish between the Andromedas fish and the shellfish because of the nature of the complaint. And in the end, he says it doesn't matter. In the end, a fish is a fish. And we have the right in the marine claims. What is your position then as to the fact that as to the marine claims for SOC that Judge Bolt didn't make an allocation one way or the other, perhaps left it open? Your Honor, Barbara Lane's report talks about SOC traveling to the marine waters. She talks about them trading, procuring at the marine waters. There's no indication of frequency. There's no indication of customarily fishing in those areas. There's nothing in her report that indicates that they did anything more than go to the marine waters to procure fish. To procure marine life unavailable in their own territory. Now, that suggests to me just ordinary language. Well, the Andromedas fish are available in their own territory. So they're going down to procure marine life unavailable, which means to me shellfish. That seems to me the ordinary understanding of that language, to procure. Now, if I'm putting myself in their position going down to procure it, I'm not going to trade for shellfish. I'm going to dig them, of course. You don't go down to the beach and trade for somebody else for shellfish that are right there to be dug. Your Honor, that's a difficult discussion because there was a lot of trade. I understand there was a lot of trade. But it does not make sense to me that I'm going to go down or a tribal member is going to go down to the beach and trade for shellfish that are available for the digging. And that's available for the digging, the point that I was going to make, Your Honor. Because there's this idea that these areas were just open and available to all tribes to come and do whatever they wanted. Nothing could be further from the truth. Territories were protected. You didn't just come into another tribe's territory and say, we're going to start collecting fish here. There were wars that happened. There were canoes that were stored to protect from incursion into areas. So this wasn't something that was just you come and go wherever you want and take fish wherever you want. That's not the scenario, and that's in the record of this case. But I ask you, and this may be beyond what you were prepared to argue, but having to do with the 1980 report, it doesn't appear to be in the record. So we don't know if there's anything new by Dr. Lane there that was beyond the earlier report. Has that report been considered by any court, to your knowledge? Your Honor, I'm unaware of that, to be frank. I apologize for not having an answer because it wasn't part of the record. I didn't review it, and I just can't speak on that. All right. I appreciate that. Thank you. Okay. Thank you, Counsel. Thank you, Your Honor. You may have placed the court. Mr. Feander, maybe I could pick up where I was asking the last counsel, because this really goes more to your Baker River claim. You want to introduce, if you were to be remanded, the 1980 report by Dr. Lane. But my understanding is that's not in the record. And so we don't even know if there's any additional information in there that was not before Judge Bolt. Do you have a response or information you can provide on that? I would say that where the district court made an error regarding the 1980 Lane report was, and the record is very short. The district court judge issued two orders. But is the 1980 report in the record? I didn't find it. It's not in the 1974 record. No, is it in the record? It is in the record in this case that you're hearing the appeal on. It's ER 12. In ER 12? Where the district court aired. The reference to it in ER 12, is the report itself in the record in front of us? No, that's the error that the district court made. The district court said, well, it seems like this would include information already considered by Judge Bolt because Dr. Lane was an expert witness. But did you put the report in the record before the district court? No, not the record. We didn't get to because the district. You can put in there whatever you want. They don't have to consider it. But we're kind of left in this very odd position where you're making this argument about the 1980 report. Which has not been actually in the record or wasn't submitted by you to argue to the district court. Why it should make a certain determination. That's what I'm having a little trouble with. Okay. Well, what we have a trouble with is the district court concluded without even reading that report. Okay. Which we had informed the court that we were going to use in support of the claim. But you didn't. Where the district court simply without even reading the report or having it, which was an accident in 1974, said, well, I think it probably concludes information Judge Bolt already considered. But just to be clear, you didn't submit it to the district court in any of your filings. And so, therefore, we don't have it either. Is that right?  And the district court didn't have it. But you were in a position, although this is slightly odd, you were in a position that's analogous to 12B-6. That is to say, you were making allegations. Yeah, but under 12B-6, if that's a standard. Well, that's what I mean. It's a low standard. A request for determination is like a complaint. It's presumed to be true and you don't plead evidence in it. You didn't have to include the record. That's the point of my question. Yes. Well, let me get into the rebuttal. Throughout, Judge. Counsel. We're almost out of time. The other side went about two minutes over, so I'll give you about two minutes. Well, when you're determining constitutional rights and whether a right is protected by the Constitution, it's kind of easy because there is a constitutional convention. There are the records of James Madison. You got stuff to read. Okay. And treaties are constitutional law under Article 6 of the U.S. Constitution. But in order to interpret what rights are protected by those, you know, the founding father was Judge Bolt. Okay. Counsel for Upper Skagit and I brought up the Blue Book. And what's important is not what Judge Bolt didn't say. It's what he said. Okay. He said at the start of his decision for each of the plaintiff tribes, the findings set forth regarding their principle, usual and custom places are includes some, but by no means all of them. So all of the tribes, Soxhawtla tribes, customary fishing grounds were not included. And it's inappropriate for counsel to argue that Judge Bolt must have known this or the case primarily focused on this or that procure means trade. Judge Bolt said none of those things. Okay. Procure means you go get them. If he meant trade, he would have said trade. The other thing is, let's talk about this 2001 decision that there are two paragraphs. That case was initiated by the upper Skagit tribe under paragraph 25, a one, which means that you are, you are alleging that a tribe like Soxhawtla is exceeding the scope of the decree. They're not in conformity with it. So in 2001, like Counselor Upper Skagit said, the tribe opened a season at the mouth of the Cascade and Skagit rivers. Unfortunately, a couple of fishermen floated too far down river. The judge found that they were actually in the main stem of the Skagit. The Skagit wasn't listed in finding a fact 131. That's all you look at. They're outside. Thank you, counsel. I think we have your argument.  This case is submitted and we are adjourned for today. All rise. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals for the United Circuit will now depart. For this court, for this session, now stands adjourned.
judges: McKEOWN, FLETCHER, BUMATAY